STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a corporation, Plaintiff,

v.

The UNITED STATES of America, Defendant.

Civ. No. 2719.

United States District Court
S. D. Illinois, S. D.

Nov. 21, 1961.

Allen T. Lucas, Springfield, Ill., Meyers & Matthias, Chicago, Ill., James C. Craven, Springfield, Ill., for plaintiff.

Edward R. Phelps, U. S. Atty., Springfield, Ill., Bruno Lederer, Dept. of Justice, Washington, D. C., for defendant.

POOS, District Judge.

The plaintiff, State Farm Mutual Automobile Insurance Company, an Illinois corporation, brings this suit against the United States of America to recover an alleged unlawful, illegal and erroneous assessment of income taxes for the years 1955 and 1956. The action is asserted and brought under Title 28 United States Code, § 1346(a) (1). All formal steps preliminary to this suit have been carried out. The plaintiff filed its returns and paid income taxes for the years 1955 and 1956. Thereafter the Commissioner of Internal Revenue examined the returns for the years in question and as a result of the examinations determined that there was an alleged deficiency in income due for the year 1955 in the sum of $109,-532.00, and for the year 1956 in the sum of $130,850.00. The Commissioner determined that $10,952,094.00 received by plaintiff as membership fees from new policyholders in 1955 and $13,080,235.00 in 1956, constituted a portion of the net premiums of plaintiff within the purview of Section 823 of the Internal Revenue Code of 1954, 26 U.S.C. § 823, and therefore includable in gross revenue for the purpose of computing the tax imposed by Section 821(a) (2) of the Internal Revenue Code. Pursuant to this determination the defendant assessed and collected for the year 1955 additional income taxes in the sum of $109,532 plus interest in the sum of $18,675.20, and for the year 1956 the sum of $130,850 plus interest of $14,458.91. A claim for refund for each year was filed on January 14, 1959, both of which were rejected on October 5, 1959.

The plaintiff alleges that the aforesaid amounts of $10,952,094.00 and $13,080,-235.00 received by the plaintiff for the respective years as membership fees were properly excluded from net premium for each year because said membership fees which were received only from new policyholders do not constitute net premiums within the purview of Sec. 823 of the Internal Revenue Code of 1954, and the determination by the defendant that said membership fees are net premiums and the inclusion of these amounts in gross income for the purpose of the tax computations imposed by Section 821(a) (2) was erroneous and without warrant in law, and that the aggregate sum of $273,516.11 collected was done

so illegally and without warrant and authority of law. The plaintiff claims this amount with interest thereon from December 23, 1958 and requests judgment therefor. The defendant denies the allegations.

This case was tried without a jury on a stipulation of facts and the testimony of four witnesses, three of them for the plaintiff and one for the defendant, together with certain exhibits introduced by both parties. All procedural conditions precedent to the bringing of this suit have been met.

From the stipulations and evidence it appears that plaintiff was incorporated as a mutual insurance company in 1922 under the laws of Illinois and writes primarily automobile insurance; that the company from its inception has charged a membership fee which entitles the member to make an application for insurance in the company for the coverage for which the applicant has paid a membership fee; that the membership fee purchases no insurance; that membership fees are not changed at the time of a different rate filing, and have no connection with or relationship to the rate filings; that rate filings are made with the various states as required by state laws; that there have been occasions when persons apply for membership in the company who have not as yet made application for insurance; that all policyholders are members, and there are members who are not policyholders; that there are quite a few million members who are not policyholders who have a right at any time to apply for insurance at some subsequent time, and they will be accepted if they are insurable risks under the standards of the company; that if a membership fee is once exacted, it is never again exacted for that coverage.

Gilbert B. Brown, comptroller for plaintiff, testified that he was experienced with insurance business since 1925, and that his understanding of the word "premium" would be the consideration paid to an insurance company for its acceptance of the risk. This witness, on cross-examination, stated that the privilege given to members who are not policyholders is the right to apply for insurance at any time they are deemed a desirable risk, but they cannot vote unless they are a policyholder, nor are they entitled to share in any dividend distribution unless they are policyholders; that a membership fee once collected gives the member the right to apply for insurance at any future time; that in the past, people who do not own an automobile have come to the Company and applied for membership; that in the years 1955 and 1956, a few applied for membership without applying for a policy. The witness further stated that the expression, "underwriting expenses", is interpreted by two schools of thought, one being those expenses necessarily incurred in determining the qualifications, the eligibility of the insured, and the actual issuance of the policy, and the other school of thought in addition includes acquisition costs and underwriting costs; that acquisition costs are used generally in setting premium rates.

It further appears that under the Illinois law, plaintiff is not required to pay a premium tax because it is a domestic company; that the premium tax is applicable only to foreign insurance companies, those domiciled in other states, but these companies organized on the same plan would not have to pay any premium tax on membership fees because Illinois law does not provide for a premium tax on these fees because membership fees are not enumerated in the Illinois statute.

It further appears that plaintiff was organized on the membership fee plan in 1922 without any thought of income tax evasion, because at that time there was no income tax levied on insurance premiums of mutual companies by the Internal Revenue Code, the tax having been first imposed in 1939 [§ 207(a) (2)] by Section 821(a) (2) of the Code.

It appears that the membership fee plan is not permitted by the laws of Texas and there agent's commissions are paid from premiums as selling expense

set aside for the various classes of agents, and that the company pays income tax on the premiums paid in Texas, less return premiums and premium paid for reinsurance.

The Government's Exhibit 1, the plaintiff's report to its members for 1956, at page 18, shows under the column marked "where the money comes from," premium and membership fees rounded to $287,-250,000.00, then investment income of $9,000,000.00, a total of $296,000,000.00. The premium and membership fees are not segregated in this report. Page 3 of the same exhibit shows the total premium income to be $287,250,000.00. The annual statement for 1956 shows this figure broken down to premiums of $274,-170,000.00, and membership fees of $13,-080,000.00, making the above total. Government's Exhibit 2, the similar report for 1955, checked with the annual statement, shows a premium and membership fee total of $241,901,000.00, which breaks down to $230,949,000.00 of premium income, and $10,952,000.00 of membership fees. This witness further stated that Government Exhibits 1 and 2 for 1955 and 1956 are general reports to existing policyholders of the general overall conditions of the Company during the year. These reports are matters of public relations, and the difference between them and the annual reports is that the annual reports taken from the books of the Company reflect the actual breakdown of figures. The annual statement is filed by the Company in each of the States in which the Company does business, including all 48 states and territories in 1955 and 1956, except certain New England states in which the Company does no business.

Lowell S. Rinehart, Assistant Treasurer of Nationwide Mutual Insurance Company of Columbus, Ohio, formerly known as the Farm Bureau Mutual Automobile Insurance Company, testified in behalf of plaintiff that his company operates on the membership fee plan identical to that of plaintiff, and that in 1947 the Treasury Department, Office of Internal Revenue, through Mr. E. I. Mc-Larney, Deputy Commissioner, ruled that "the fees charged the policyholders for membership in the company do not fall within the definition of "net premiums" in section 207(a) (2) of the Code and should not, therefore, be included in its taxable income" (Plaintiff's Exhibit 11). He further testified that in 1960 the Internal Revenue Service revoked the 1947 ruling on the authority of the case of State Farm Mutual Automobile Insurance Company v. Duel, 244 Wis. 429, 12 N.W.2d 696 (1944), aff'd 324 U.S. 154, 65 S.Ct. 573, 89 L.Ed. 812 (1945), but that in the intervening and prior years his company had not included membership fees in its income tax returns as net premiums.

Witness Harold E. Curry stated that he was Vice-President and Actuary of State Farm Mutual Automobile Insurance Company since 1945, and prior to that time from May, 1929, was actuary of the Farm Bureau Mutual Automobile Insurance Company of Columbus, Ohio; that he was familiar with the membership fee plans of plaintiff and the Ohio Company and that both are essentially the same; that the State Farm Mutual plan contemplates that each new applicant for insurance prior to the time he applies for insurance shall become a member of the Company by applying for membership by payment of the membership fees for the various coverages of insurance in which he is interested; that the applicant for membership can subsequently apply for a policy of insurance for the coverages he desires on his automobile; that this plan is not new or unique and has been used by plaintiff since its inception in 1922, and the plan is used by a number of other insurance companies at the present time; that the membership fees that are charged by companies with which the witness was familiar are not considered a part of premium income, but they are separate and apart from premium income because they purchase no insurance and in most instances are fees that are assessed but once at the time that the applicant initially applies to the company; that there

is a separate membership fee for each type of coverage, as for example, for a comprehensive coverage, a fee of $2.00; for bodily injury and property damage, a fee of $7.00; and for a $50.00 deductible, a fee of $6.00; and then to activate the insurance you would have to pay a premium on comprehensive coverage, $6.90; for collision coverage on an actual value basis, $27.00 to $29.00; and for bodily injury approximately $40.00; that these total costs for premiums for these three types of coverage would be $73.90 in addition to the membership fees, and for each subsequent year the premium, assuming no rate changes, would be $73.90 without any further membership fee, and there would be no further charges for membership fees even if insurance was not carried in any subsequent year; that the member at any time in the future would be entitled to apply for a policy without payment of another membership fee; that the basic reasoning of this plan was that it is an equitable way of assessing the cost of insurance to an individual; that in the instance of plaintiff, it was of the conviction that it was going to issue policies on a continuous basis, that is, from each six months to each six months, on a continuing basis over a period of years, and that the initial cost of determining whether that applicant was a satisfactory risk for the Company, it would be an extra cost that should be borne by that individual at the time he applied for membership in the Company; that it was a cost assessed to the individual to determine their qualifications and eligibility to become members of the company, a non-recurring cost once having been paid and eligibility having been determined, the membership was irrevocable; that if the information furnished by the agent is complete, the risk will be accepted, but if incomplete, the application will be supplemented by information from a retail credit or other investigating agency, or in some instances state motor vehicle accident records are consulted, and from sources of information that are available and utilized at all times; that if the

policy is not issued, the membership fee is returned, and if issued and cancelled in the first 60 days of the initial policy period because it is determined that the risk fails to meet the Company's underwriting standards, the membership fee will be returned to the applicant.

The witness further testified that one of his responsibilities as actuary for the plaintiff was to make and file rates for his company in the various states; that the membership fee is not utilized at all in the determination of rates because it doesn't provide any insurance coverage; that in many states the membership fees aren't filed and are not considered a part of the rate filings; that the membership fee does not purchase any insurance protection and is not given any consideration in the promulgation of the schedule of rates of the company. Referring to plaintiff's exhibit 12 the witness pointed out that the membership fees are not proportionate to the rates, and that on collision coverage there could be a premium ranging from $6.40 to $104.10, yet the membership fee would remain constant at $6.00.

The defendant called, as its sole witness, Robert I. Mehr, Professor of Finance at the University of Illinois, specializing in the insurance field. The witness stated that he has taught insurance on the college level since 1945; that he was familiar with the ordinary receipts and expenses of insurance companies generally, which come in a general way from premium, investment income and from paid in surplus in mutuals and paid in capital and surplus in stock corporations; that the expenses associated with insurance are underwriting, which can include all expenses of acquiring the policyholder, processing him, administering the insurance, all expenses associated with the payment of losses or claims, and the losses themselves; that the non-recurring type of expenses testified to as initial commissions and investigation expenses, are normal underwriting expenses; that in his experience and study he was not familiar with any textbook or article that has taken the position

that initial acquisition costs are not normal underwriting expense; that he was familiar generally with the way insurance companies determine what their premiums should be, and how premium rates are established; that the three broad factors are the projected losses, the expense of operating the company, and a contingency in mutual companies and profit in stock companies.

The witness stated he had prepared Government Exhibits 3, 4 and 5. These exhibits show the leading mutual insurance companies in terms of premiums written in the United States, showing those that charge membership fees or policy fees, the amount of net premiums, which is to indicate in terms of premium volume among the largest companies that do have membership fees, and to show that it is not a practice to charge membership fees or even policy fees in taking care of acquisition. Exhibit 4 shows the list of the 387 mutual insurance companies in 1955 with over $200,000.00 of premium income. It also shows that the total net premium was over two billion dollars, and total membership fees were $13,784,000.00 charged by the three companies indicated on Exhibit 3, namely, State Farm Mutual Auto Insurance Company, Nationwide Mutual Insurance Company, and Nationwide Mutual Fire Insurance Company. The total of the membership fees and policy fees of $14,972,000.00, and deducting the policy fees of $13,784,000.00, slightly over a million, represents the policy fees that are charged by the other 381 companies, which the witness said indicates that the practice of charging policy fees in terms of size of insurance operations is not an important factor in the mutual insurance business, and the same comparison is again made for 1956.

The witness stated as he understood the reason for the membership fee at the commencement of their business was because the insurance departments of the states regulate the assets and liabilities of the various companies as to unearned premium reserves; that this is a liability; that the law of Illinois did not require them to include membership fees as premiums; that the unearned premium reserve is a redundant type of thing; that, for example, an insurance company sold a policy and charged a premium of $120.00, on which it could charge off the liability reserve on a monthly basis, which would enable it to charge off $10.00 monthly as earned; that using the figure of $120.00 premium to start with, and a commission of 20 per cent being allowed the agent for procuring the insurance, the agent would get $20.00, and the Company would get $100.00; that in considering other expenses, the Company would get a little less than this, so the effect would be that you'd have a Company with less than $100.00 in cash, or an increase in assets of less than $100.00 to offset a liability increase of $120.00, which would decrease surplus by that difference; that thus, when a Company grows they find that their surplus is going to continue to decrease if they continually grow and charging the full premium, putting everything into the premium, actually would limit the growth of the Company; that taking out of the premium certain parts of the cost, such as membership fee, and then say they collect $20.00 of membership fee and $100.00 premium, and the Company not having to show the $20.00 as part of their unearned premium liability, then it would not make an inroad on the surplus of the Company, and it can grow without out weakening the capital structure of the Company.

The witness further stated that an insurance premium is primarily a matter that is defined in a contract of insurance; that you get the policy for the premium stated in the insurance contract; that if they are going to refund the membership fee, keeping in mind the contract, and if the fee is refunded within a period of time then he would consider it to be a part of the premium because the repayment of the fee is an obligation of the company; that it is also an obligation of the company to pay back the membership fee, if the risk is not accepted.

The witness further stated that in his opinion when Congress says net premium under the Act, the term net premium means gross premiums written or received on insurance contracts during the taxable year, less returned premiums and premiums paid or incurred for reinsurance, and that when it speaks of the contract, Congress means the policy of insurance. He said that he thought, though, that it would be impossible to get the contract, without all underwriting costs that are involved in issuing the contract, and he assumed that the membership fee is in lieu of underwriting costs, and that it would be impossible to write a policy without incurring underwriting costs; that it could be taken out of premium. He said that two contracts are made by this Company with their policyholders; that in the first they hold out to the applicant that for a consideration they will sell him a membership fee in the Company, and if the investigation under the membership fee paid finds him eligible for insurance, then the second contract is sold, a policy for a further consideration called premium, which is the policy of insurance. He said that in his opinion he considered the membership fee as a part of the premium, because if this Company were to dispense with membership fees, they would have to add to the premium in order to afford to write insurance.

This government witness further testified that the statute was passed after the insurance company started the practice of operation on a membership fee basis, and that the practice of the company was unrelated to the matter of the tax issue and was in accordance with unearned premium reserve, the reason for writing the six-months policy rather than an annual policy.

He further stated, though, that in his opinion it would not be necessary to write "membership fee" into the statute in order to include the membership fee as a part of the premium because the general method of operation of insurance companies is to charge all these things to premiums; that when a company has no membership fee, the initial costs of commissions, investigation and acquisition, are met out of premiums that they charge in the policy, which is the general practice in the insurance business; that generally speaking, if a company does not have a membership fee to meet initial costs, they would have to be met out of some other charge, presumably the premium, and this is true of mutual companies generally; that the commissions that are paid to selling agents and other acquisition costs are normal underwriting expenses of an insurance company, and are considered in determining the amount of premium; that if the State Farm Mutual had another way of paying for acquisition costs, rather than through premiums, they would need to charge less premiums; that it would reduce the tax liability if the membership fee is not included as a part of the premium, which would put them in a more favorable competitive position insofar as the tax is concerned.

This witness testified that in insurance terminology the word "premium" means simply the amount necessary to be charged in order to procure the coverage under the contract, which would include the initial acquisition costs; that in his opinion one of the reasons why Congress defined net premiums in the statute is that there are two connotations of the term "net premium"; that what the statute says is that all of the premium is taxable, except what they give back in dividends, but they don't take away the expenses of operating the business; that every time we use the term "net premium" in our writings, we have to explain whether we mean gross premiums minus dividends or whether we mean gross premiums minus expenses, and that is the reason Congress tried to spell out what the term "net premium" meant.

The Government witness further stated that in his opinion "premium" would be the cost of losses plus the cost of field and acquisition expenses, plus the allotment for profit, the whole amount the policyholder would have to pay in order

to procure the policy; that the membership fee would take care of the acquisition and some of the field expenses, which are normal underwriting expenses; that the membership fees exacted from the members would be premium for the year in which they were paid.

I have set out fully an abstract of the evidence introduced by the plaintiff and the government. The matter to be determined is the meaning of the word "premium" as used in Section 823 of the Internal Revenue Code of 1954, and to determine whether or not the moneys charged by plaintiff under the membership fee provision of its by-laws and policy are to be included as premiums for the purpose of assessing the tax imposed by Section 821(a) (2) of the Internal Revenue Code.

Section 823 of the Code, in so far as applicable here in defining "net premiums", provides,

"(1) Net premiums.—The term 'net premiums' means gross premiums (including deposits and assessments) written or received on insurance contracts during the taxable year less return premiums and premiums paid or incurred for reinsurance. * * *"

To reach a conclusion as to whether or not the term "net premium" reaches the membership fee and makes it taxable, the factual situation under which the membership fee is exacted must be examined. This Company was organized under the law of Illinois in 1922 on the membership fee plan. The tax provision of the Internal Revenue Code assessing a tax against net premiums was not enacted until 1939, and from that time until 1954 the membership fee was never considered to be premium by the Internal Revenue Service, and the 1947 letter from the Deputy Commissioner of Internal Revenue stated that it was not taxable as premium income. The government makes no contention that the plan of charging a membership fee is a tax evasion device or tax avoidance scheme.

The provisions of the by-laws of plaintiff providing for membership fees are:

"Article II.

"Section 1. Every policyholder shall be a member of the Corporation. The Board of Directors shall determine the eligibility and conditions of membership and may make equitable classifications of members as respects each kind of insurance. Each kind of insurance shall bear its equitable proportion of the losses, expenses and liabilities of the Corporation computed as required by law. . The Board of Directors shall determine the territory in which the Corporation shall operate and the territory from which members shall not be taken.

"Section 2. Membership shall begin upon the taking effect of the insurance and shall end on the cancellation or other termination of the same.

"Section 3. Each member shall be entitled to one vote in person, or by proxy at all meetings of members * * *

* * * * * *

"Article VII.

"Section 1. Membership fees for the different kinds of insurance transacted by the Corporation may be fixed in such amounts and upon such conditions as ordered by the Board of Directors and set out in the policy.

"Section 2. (a) The premiums for the different kinds of insurance transacted by the Corporation shall be in such amounts and upon such conditions as may be approved by the Board of Directors. No member shall be subject to assessment or contingent liability upon any policy at any time.

"(b) Subject to the provisions of law regarding return of excess premiums, the Board of Directors may authorize from time to time such refunds or credits to policyholders from the savings and gains of the

Corporation and upon such terms and conditions and in such amounts or percentages as may, in their judgment, be proper, just and equitable."

In accordance with the above by-laws, there is written into and included into each policy issued by the Company, except in the State of Texas, the following mutual conditions:

"(1) Membership. The membership fees set out in this policy, which are in addition to the premiums, are not returnable but entitle the named insured to insure the automobile for the coverages for which said fees were paid so long as this Company continues to write such coverages and the insured remains a risk desirable to the Company.

"While this policy is in force, the named insured is entitled to vote at all meetings of members and to share in the earnings and savings of the Company in accordance with the dividends declared by the Board of Directors on this and like policies.

"(2) No contingent liability. This policy is non-assessable.

"(3) The annual meetings of the members of the Company shall be held at its home office, Bloomington, Illinois, on the second Monday of June at the hour of 10:00 A.M., unless the Board of Directors shall elect to change the time and place of such meeting, in which case, but not otherwise, due notice shall be mailed each member at the address disclosed in the policy at least ten days prior thereto."

Texas law does not permit mutual automobile insurance companies to do business of insurance on a membership fee basis.

The plaintiff takes the position that under the law and under its by-laws and policies issued, the membership fee is not a net premium and therefore not includable in the tax return as net premium under Sections 821(a) (2) and 823(1) of the Internal Revenue Code, while the position of the government is that taxpayer plaintiff's membership fees are part of net premium and therefore includable. The position of the government is that the word "premium" is a technical insurance term, and that when Congress used the word "premium" in imposing a tax, it intended to tax a form of receipt, generally known in the insurance field as a "premium". It takes this position in spite of the fact that it previously, from 1939 to 1954, had not regarded the "membership fee" as included in the word "premium". This was clearly stated to be the position of the Bureau of Internal Revenue under a similar factual situation in the Bureau's letter under date of September 4, 1947, to the Farm Bureau Mutual Automobile Insurance Company of Columbus, Ohio, now Nationwide Mutual Insurance Company, as above mentioned. This letter, while not directed to plaintiff, clearly shows that the Bureau of Internal Revenue followed the reasoning and import of that letter in so far as plaintiff and others similarly situated until the return of plaintiff was audited for the year 1955, when a contrary position was taken and the District Director and the Bureau held that the membership fee was "net premium". The Bureau, during the course of this tax assessment, and the fixing of the deficiency, and after the filing of this suit in the year 1960, addressed a letter to Nationwide in which that Company was advised that the previous letter of September 4, 1947 was revoked. The Internal Revenue Service states in this letter of reversal that it relies entirely on the rationale of State Farm Mutual Automobile Insurance Company v. Duel, 244 Wis. 429, 12 N.W. 2d 696. While a study of the Pilot Duel case, 240 Wis. 161, at 189, 1 N.W.2d 887, 2 N.W.2d 871, shows that the Wisconsin court did not hold membership fees to be a part of premium, some of the language used might lead one to that supposition. This will be hereinafter pointed out. As a result of this case, the Wisconsin legislature corrected the situation so that plaintiff and other com-

panies so situated can now do business on the membership fee plan. See Section 204.405, Wisconsin Insurance Code.

In placing reliance on this case, the Bureau disregards its own construction of the term "membership fee" for the long period above mentioned as well as the two cases of State Farm Mutual Automobile Insurance Company v. Carpenter, 31 Cal.App.2d 178, 87 P.2d 867, and Kreifels v. State Farm Automobile Insurance Co., 62 N.D. 667, 244 N.W. 880, and also as well as the position of Congress wherein Congress, in passing the insurance code for the District of Columbia, specifically included the term "membership fee" in the District of Columbia Insurance Code in laying a tax on 2% of the Company's "policy and membership fees and net premium receipts or consideration received on all insurance and annuity contracts" (Title 47, § 1806, District of Columbia Code.) While Congress included "membership fees" as taxable in this Code, it did not include "membership fees" in Sections 821(a)(2) and 823 of the Internal Revenue Code when, in placing a tax on net premiums, it said, in defining net premiums,

> "Sec. 823(1) Net premiums.—The term 'net premiums' means gross premiums (including deposits and assessments) written or received on insurance contracts during the taxable year less return premiums and premiums paid or incurred for reinsurance."

It is obvious that Congress specifically included the term "membership fee" in the District Code, while it did not do so in Section 823(1) when it defined net premiums. The defendant, by its reasoning, based on the Duel case, seeks to include the term in Sec. 823(1) by construction. In fortification of its position, it introduced the testimony of an expert on insurance whose reasoning was that since the term "membership fee" and the money derived therefrom was used for purposes usually paid out of premiums, that the plaintiff's "membership fees" are a part of net premiums.

Defendant further says that Congress, in using the word "premium", used it as a technical insurance term, and intended to tax a "form of receipt" generally known in the insurance field as a premium, and out of which premiums are paid commissions to the soliciting agents or agencies, and lays the charge that the so-called "membership fee" is a misnomer and does not entitle the policyholder to any rights or privileges whatever other than the right to buy a contract of insurance.

The Wisconsin court in the Pilot Duel case, 240 Wis. 161, at 189, 2 N.W.2d 871, at 872, on rehearing plainly stated that the decision in the case was "put upon the ground that defendant's plan violates the statute because of its use of a membership fee as a consideration for a life privilege; a fee to which is allocated a portion of the expenses of furnishing insurance protection, which is treated as earned at once and against which unearned premium reserves cannot be set up as required by statute." The language clearly narrows the plan of insurance operation involved in the Duel case to the sole question of setting up insurance reserves under Wisconsin law. While the words "split premium" are used in the language of the opinion, the court does not hold that "membership fees" are a part of premium. If the holding of the court had been that membership fees are premium, then the court would have directed that membership fees were a part of premium and would, of necessity, have to be set up as a part of premium reserve, resulting in a holding that a license must be issued, rather than a holding that the plan of operation was illegal under the particular reserve statute.

In the case of State Farm Mutual Automobile Insurance Company v. Carpenter, supra, the court held that "membership fees" were no part of gross premiums. In answer to the question, the court said:

> "In resolving the issue in favor of the respondent the learned trial judge ·expressed his reasons in ·a

memorandum opinion with which we are in full accord and which we adopt as our reasons for an affirmance of the judgment. This reads:

" 'Are the membership fees here involved a part of the gross premiums of plaintiff within the meaning of California Constitution, Section 14, Article 13?

" 'There can be no question that in ordinary usage "the word 'premium' in the law of insurance * * * means the amount paid to the company as consideration for insurance." (32 C.J. p. 1192, Sec. 324; 14 Cal.Jur., p. 469, Sec. 42.)

" 'Under the testimony in this case (the affidavit of Beedle admitted by stipulation) and the language of the application and policy I am satisfied that the membership fee is no part of the consideration for the insurance. * * *'

"The statement in the memorandum that the membership fee is no part of the consideration for the insurance is fully supported by substantial evidence, * * *.

"It appears from the reporter's transcript without controversy or dispute that those membership fees are charged to all applicants for membership, that, though a membership entitles the holder to apply for insurance, it does not entitle him to receive it, and that the membership fees paid are not returnable if insurance is rejected. It appears equally that if the member elects to exercise his option, he may purchase insurance upon payment of the required premium, but that if he does not so elect, and does not pay the specified 'premium', he receives no insurance protection.

"This evidence, taken with all the inferences which are available to respondent, is sufficient to support the * * * findings of the trial court that the membership fees are no part of the consideration for the insurance, and hence are not to be included in the specification of 'gross premiums' as contemplated by section 14 of article 13 of the Constitution."

The case of Kreifels v. State Farm Auto. Insurance Co., 62 N.D. 667, 244 N.W. 880, discusses membership fees, premiums and premium deposits. In holding that a membership fee was no part of the premium, the Court said:

"A membership fee for the right to secure insurance and for the benefits as a member of the company is required, but is no part of the premium for insurance * * *."

Another case reaching the same conclusion is State Farm Mutual Automobile Insurance Company v. Earle, No. 125–696, Circuit Court, Multnomah County, Oregon, where the court said,

"The Supreme Court of North Dakota, in the case of Kreifels v. State Farm Mut. Auto. Ins. Co., 62 N.D. 667 [244 N.W. 880], held directly the membership fee was not a part of the premium. The attorney general of the State of Michigan reached the same conclusion in a very lucid opinion, and Judge Maurice T. Tooling, Jr., of the Superior Court of California * * * reached a like conclusion.

"A reading of the policy indicates clearly that the membership fees are not considered as a part of the consideration for the insurance.

"The Court is of the opinion that the reasoning in these cases is clear and well founded, and therefore has reached the conclusion that the membership fees are not taxable under the sections above referred to."

█ The law of insurance and contract rights between insurer and insured has, in my opinion, a bearing on the meaning of the statute in question. In 44 C.J.S. Insurance, Part VII, Contract and Policy § 223, p. 928, the text states:

"A contract of insurance is a commercial or mercantile contract. While it has some features which distinguish it from an ordinary com-

mercial contract, in general respects it is like any other contract and is governed by the same rules. Being a voluntary contract, as long as the terms and conditions made therefor are not unreasonable or in violation of legal rules and requirements, the parties may make it on such terms, and incorporate such provisions and conditions, as they see fit to adopt. Thus it is competent for the parties to contract as to the place of acceptance and the effective date of the agreement * * *. The contract as made measures the rights of the parties, and, in the absence of fraud or mistake * * * cannot properly claim that he is not bound by a written contract of insurance, or certain provisions thereof * * *.

"The policy is a contract of insurance in writing, binding on both parties and governed by the rules which govern any other contract except as far as modified by statute."

To the same effect is the rule announced in Pink v. A. A. A. Highway Express, 314 U.S. 201, 62 S.Ct. 241, 246, 86 L.Ed. 152, where the Court said:

"A policy of insurance may be a contract whose terms purport to define completely the relationship and obligations of the parties. Here the policy, which was on its face a contract and nothing more, stipulated only for obligations to be performed by the insurer upon payment of the prescribed premium.

"The policy's stipulations contained no provisions making the insured a member of the association or subjecting him to liability for assessment as such. Although the company was denominated 'mutual', that term does not signify that policyholders are members or subject to assessment.

"Without the command of some constitutionally controlling statute, the Georgia court was free to interpret the obligations of the policy as limited to those stipulations expressed on its face and as excluding any stipulation for membership or for liability to assessment which the contract did not mention."

Again, in the text of 29 Am.Jur., Sec. 501, Insurance, p. 820, a premium is defined as:

"An insurance premium may be defined as the agreed price for assuming and carrying the risk—that is, the consideration paid an insurer for undertaking to indemnify the insured against a specified peril. The premium and the time at which it is to be paid are essential terms of the insurance contract, and since the risk is also an essential element of the insurance contract, it is an implied condition that no premium is due unless the risk attaches."

Apply the law to the factual situation here. The parties, the insurer and the insured, make the contract. The contract in question provides for mutual conditions, viz., membership fees set out in this policy, which are in addition to premiums, are not returnable but entitle the named insured to insure one automobile for the coverages for which said fees were paid so long as this Company continues to write such coverages and the insured remains a risk desirable to the Company; that while the policy is in force the named insured is entitled to vote at all meetings of members and to share in the earnings and savings of the Company in accordance with the dividends declared by the Board of Directors on this and like policies. The declarations clause provides that by acceptance of the policy the named insured agrees that the statements in the declarations are his agreements and representations, and that the policy is issued in reliance upon the truth of such representations and that the policy embodies all agreements existing between himself and the Company, or any of its agents relating to this insurance. The policy further provides:

"State Farm Mutual Automobile Insurance Company, Bloomington,

Illinois, a Mutual Insurance Company herein called the Company, in consideration of the premium paid and in reliance upon the declarations made a part hereof, agrees with the named insured, subject to the provisions of this policy.

"Insuring Agreements:

"(1) To pay all damages * * *

"(2) To defend any suit, etc., * * *"

It is here noted that the insuring agreements are made in consideration of the premium paid. The agreement, the policy, was made between the policyholder and the plaintiff. Under the law, as above set out, the contracting parties had a legal right to make such contract. This type of contract was conceived in 1922, at the time the plaintiff corporation was created. The plaintiff is a mutual company and the policy-holding member is permitted to vote at all annual and special meetings of the plaintiff. They have the right and the by-laws provide that at least 20 policy-holding members must elect the directors of plaintiff. Any policy-holding member has a right to be elected to the Board of Directors, and in fact no Director can hold office unless he is a policy-holding member, all as provided in Article IV, Section I of the By-Laws. Under the ordinary capital stock company, the policyholder has no such right. Referring again to the contract and the By-Laws of the plaintiff, it is obvious that the policy-holding member, by reason of his membership, gets more for his membership fee than the right to buy insurance. He gets the right to take part in the management and running of the plaintiff company and the right to share in the earnings of the Company by lower cost insurance. The evidence shows this to be true. The policyholder, the premium payer, gets no such right in a capital stock insurance company. In addition, while the evidence shows that the membership fee is used to pay commissions to the procuring agent, the district agent and State organization representing State Farm Insurance Companies, and that such payments in capital stock companies are usually paid out of premium income, the fact remains that this membership fee is only exacted once and is not taken into consideration in rate making.

The evidence shows that, among other things, the membership fee is processed in a separate accounting and when received if the applicant member is a desirable risk, is immediately disbursed to the various interested agencies; that this membership fee plan, together with the six-months policy period, all as provided for at the inception of the Company, was to enable the Company to grow fast so that it would not have to reserve itself out of business, thereby solving the reserving problem and rapid growth at the same time; the evidence further shows that the Company intended to do business with its policyholders on a continuing six months to six months basis, and that in so doing it determined that the initial cost of determining whether the applicant was a satisfactory risk should be an extra cost which should be borne by the individual at the time of his application for membership. It was a cost assessed to the individual, a non-recurring cost to determine his eligibility, and once that eligibility was determined the membershp was irrevocable, even to the extent that a member would cease to be a policyholder for any year or number of years, and yet could again procure insurance by the payment of the premium only. While the expert witness offered testimony to the effect that he considered the membership fee to be a part of premium, he admitted that the membership fee plan was created before the tax statute was passed and that this practice was unrelated to the matter of the tax issue.

It further appears from this record that a ruling was issued by the Internal Revenue Bureau in 1947 to Farm Bureau Mutual Automobile Insurance Company of Ohio which ruled that membership fees lacked the essential features of an insurance premium. The plaintiff company and the Ohio Company, now Nationwide Insurance Company, do business

in exactly the same manner. The District Director in Illinois, in making the deficiency assessment and the Bureau apparently were not familiar with the 1947 ruling of the Bureau in making the assessment here sued on, for in the year 1960 they revoke the service ruling. This letter revokes a service ruling which had been in existence for fourteen years, and the letter of revocation refers to the case of State Farm Mutual Automobile Insurance Company v. Duel, and bases its reason for the revocation on the theory that the membership fee plan of plaintiff and of Nationwide were indistinguishable. This appears to be a change in ruling due to litigation. A revoked ruling was involved in City Loan and Savings Co. v. United States, D.C., 177 F.Supp. 843, the oral opinion of which is found in Commerce Clearing House Standard Federal Tax Reports, 1959, Paragraph 9518. In that case, as here, one taxpayer had obtained a ruling and another taxpayer identically organized, had conducted its business in accordance with the ruling. There the Court said:

"In effect, we have here an Appellate Board of the Internal Revenue Department, not a court, not a legislature, not Congress seeking to change the rules of the game in the middle of the game, and after the taxpayer, acting in good faith upon the prior decisions of the courts and the acquiescence of the Revenue Department, had so arranged its financial affairs as to follow a taxing plan theretofore pointed out to it, that Board renders a decision in which it seeks to overrule and upset all prior rules and decisions.

That is not quite cricket, and I say that not on the ground that the government is estopped from doing what it did. The government has a perfect right, as counsel for the government has argued, at any stage of a proceeding, at any year or at any time of the century, to change its views and test in the courts, as it is doing here, the correctness of a policy that has been followed for many years. I don't deny it that right. It has that right.

However, at the same time, there are certain equitable rules that ought to be observed by the Department when it attempts to take such a step. It shouldn't lure a taxpayer by its prior position; in this case over a period of fourteen years; to conduct its business according to certain rules that have been established and certain decisions that have been rendered and then suddenly change its views, change those views with regard to one taxpayer, and not its twin that has operated alongside of it for all the years it has been incorporated since 1912."

Irrespective, however, of this case the statute in question is a tax statute and there is doubt about it. The reasons for the doubt are as follows:

Congress, in defining the term "net premiums", states that the term means gross premiums (including deposits and assessments) written or received on insurance contracts * * * This statute includes deposits or assessments. It does not include "membership fees". The plaintiff company had been doing business for over 15 years at the time this statute was passed. It was the largest in its field. Congress, in passing this legislation, had the capability of finding out that the largest company in the field was operating on a membership fee plan, and should have known of the operations of plaintiff. It found out and knew of the operations of other mutual companies when it included deposits and assessments within the term "net premiums", yet it did not include "membership fees" in the category of the named inclusions. The Bureau of Internal Revenue, in construing this statute, found in a ruling letter, that the statute did not include membership fees.

The Congress, which is the same Congress that passes internal revenue laws, saw fit to include "membership fees" in the Insurance Code of the District of Columbia which imposes a tax of two per cent of the company's "policy and membership fees and net premium receipts or consideration received on all insurance and annuity contracts." If Congress had intended to include "membership fees"

as taxable, or had intended to impose a tax on gross receipts, it could have written the Internal Revenue Code with the same preciseness and clarity as it did when it wrote the District of Columbia Code in 1937. It cannot be denied that Congress in 1939 did not have knowledge of the term "membership fees". Congress could easily correct this by amending the law. This could have been done at any session of Congress since that year, yet Congress has failed to include the term as within the definition of net premiums. The question thus resolves itself to what is defined as the premium in the policy, and what is defined to be the premium consideration for the issuance of the policy. The policy language is,

"In consideration of the premium paid",
and the premium is set out distinct from the membership fee in the sample policy agreed to be typical of all policies, as, "Premium $48.30; Membership $17.00."

This manner of doing business by this Company has been in effect since 1922. Under its method it grew to be the largest in existence. Congress had the means to find out its method and to tax it if Congress desired. Congress had known of this type of doing business since 1937 —two years before it passed the Internal Revenue Section in question. Yet over these years it has failed to amend the statute. It is further pointed out that when Congress passed the law in 1939, the administrative ruling was in effect since September 1947, and Congress re-enacted the same language in the Internal Revenue Code of 1954.

■ While the statute hardly needs construction, yet, if for the sake of clarification it is to be the subject of construction, the construction must take place in the light of the well-established rule that a Revenue Statute will be strictly construed against the State, and in favor of the taxpayer. Where there is a reasonable doubt in the meaning of a revenue statute, it will be resolved in favor of the party taxed. Sutherland Statutory Construction, Vol. 3, p. 293.

The leading case on this rule is Gould v. Gould, 245 U.S. 151, 153, 38 S.Ct. 53, 62 L.Ed. 211, 213, where alimony was held not to be taxable income. The rule has likewise been stated in 82 C.J.S. Statutes § 396, p. 948, supported by note 35, citing numerous federal cases, and is as follows:

"As a general rule, revenue laws, such as laws imposing taxes and license fees, are construed strictly against the taxing power and liberally in favor of the taxpayer, and this general rule of construction has been applied by the courts at least where they are ambiguous or doubtful; and all doubts or ambiguities in revenue laws, such as laws imposing taxes and license fees are resolved in favor of the taxpayer and against the taxing power." (82 C.J.S. p. 948–951 and federal cases there cited.)

"Not only must a tax statute be strictly construed, but a further rule of construction involves the doctrine of contemporaneous construction which is to the effect that specific and established administrative interpretation of a Revenue Statute should not be overruled except for weighty reasons. Commissioner of Internal Revenue v. Sternberger's Est., 348 U.S. 187 [75 S.Ct. 229, 99 L.Ed. 246]. See also Baccrocco [Bacciocco] v. U. S., [D.C.], 175 Fed.Supp. 93. In fact, the case of U. S. v. Leslie Salt Co., 350 U.S. 383 [76 S.Ct. 416, 100 L.Ed. 441] took note of a situation very similar to the position of the Internal Revenue Service in this case and held that a prior interpretation of a provision of the Internal Revenue Code by an administrative agency would be considered to be most persuasive even though that agency had subsequently changed its mind.

"The rule of strict construction is aided in this case by the doctrine of contemporaneous construction, and those two culminate in even a stronger doctrine—in some cases al-

most given the effect of law—which is that if a legislative body re-enacts a prior law after an administrative interpretation has been long continued without substantial change, then the re-enactment presupposes that the legislative body has given its approval to the administrative interpretation. This doctrine is most strongly announced in the case of Jackson v. Commissioner of Internal Revenue, [7 Cir.], 172 Fed.2d 605; certiorari denied, 338 U.S. 816 [70 S.Ct. 57, 94 L.Ed. 494]."

Accordingly, the court finds as an ultimate fact that the moneys paid to plaintiff company for a membership fee in the years 1955 and 1956 is not a part of premium within the meaning of the definition set out in Sec. 823(1) of the Revenue Code of 1954, and I further find that the member policyholder who purchased a membership, in this company received more than just a policy of automobile insurance under the policy contract in question in that as part of the membership fee, he purchased a right, under the By-Laws of the plaintiff, to participate, by his vote or right to vote, in the management of the Company; that the policyholder and the insurer have a good legal right to define, by the terms of the contract, the legal rights here created, and that the insurance protection given is sold to the policyholder by the terms of the policy contract itself wherein the protection given is for the consideration of the premium which is set out definitely in the policy; that the relationships of contract of the type in question have been in existence since 1922, a period much longer than the revenue statute in question, which conclusively shows that the plan of the policy contract is not to evade the levied tax; that the plaintiff and its member policyholders have done business under the plan from the time of the tax statute in 1939 with the approval of the Bureau of Internal Revenue by its attitude and construction of the law in the case of a company similarly situated; that Congress had the right to determine the question in the first instance, writing into the District of Columbia Insurance Code definition of premium the words "membership fees," making them taxable in that instance, but omitting those words from the Internal Revenue Code definition.

Congress having thus acted, I conclude that it was the intention of Congress to omit the words from the Revenue Act, thereby leading to the conclusion that the interpretation now given to the Sections of the Revenue Code in question by the Internal Revenue Service is incorrect; and that Congress, by continuing to omit these words, "membership fees" from the 1954 Amendment was satisfied with the construction of the meaning of the word "premium" as, interpreted by Bureau of Internal Revenue prior to the taxable year 1956. In any event it is a matter that Congress can remedy by amending the Act, and Congress, not having done so, has, by inaction, given approval to the construction in existence from the time of the enactment of the Statute to the year 1954, and that such construction should not be overruled by the Bureau unless for weighty reasons, which are not shown by this record.

The facts as herein referred to, and the law as herein announced, are adopted as the findings of fact and conclusions of law in the case, and it is ordered that judgment be, and the same is hereby rendered in favor of plaintiff for the aggregate sums heretofore paid by it under protest for the tax years 1955 and 1956, plus statutory interest, and for costs of suits, and against the defendant.